UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ING BANK N.V.,

                            Plaintiff,

        - against -

M/V TEMARA, IMO No. 9333929, her
engines, tackle, equipment, furniture,
appurtenances, etc. *in rem*

                         Defendant.

Case No. 16 Civ. 95 (KBF)

---

ING BANK N.V.,

                            Plaintiff,

        - against -

M/V VOGE FIESTA, IMO No. 9168154, her
engines, tackle, equipment, furniture,
appurtenances, etc. *in rem*

                         Defendant.

Case No. 16 Civ.  2051 (KBF)

---

ING BANK N.V.,

                            Plaintiff,

        - against -

M/V OCEAN HARMONY, her engines,
tackle, equipment, furniture, appurtenances,
etc. *in rem*

                         Defendant.

Case No. 16 Civ.  2923 (KBF)

ING BANK N.V.,

                              Plaintiff,

        - against -

M/V MARITIME KING, her engines, tackle,
equipment, furniture, appurtenances, etc. in
rem

                              Defendant.

Case No. 16 Civ.  3456 (KBF)

### MEMORANDUM OF LAW IN OPPOSITION TO ING BANK N.V.'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE VALIDITY OF A MARITIME LIEN AND ITS ASSIGNMENT TO ING BANK N.V. UNDER THE LAW OF ENGLAND

## TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ...................................................................1

II.    PROCEDURAL BACKGROUND .............................................................2

III.   UNCONTESTED MATERIAL FACTS .....................................................3

   A.   THE ASSIGNMENT .........................................................................3

   B.   THE O.W. BUNKER BANKRUPTCY AND THE FRAUDULENT AND RECKLESS ACTS
        OF MANAGEMENT .........................................................................4

   C.   THE TRANSACTIONS ......................................................................6

        1.   M/V Temara .........................................................................6

        2.   M/V Voge Fiesta ..................................................................8

        3.   M/V Ocean Harmony .............................................................9

        4.   M/V Maritime King ...............................................................10

IV.    LAW AND ANALYSIS ..............................................................................11

   A.   STANDARD OF REVIEW .................................................................11

   B.   O.W. BUNKER DID NOT ACQUIRE A MARITIME LIEN UNDER THE CIMLA
        WHERE IT FAILED TO "PROVIDE" NECESSARIES TO THE VESSELS BY FAILING
        TO PAY ITS SUBCONTRACTING PHYSICAL SUPPLIER FOR EACH FUEL DELIVERY ....12

   C.   O.W. BUNKER DID NOT ACQUIRE A MARITIME LIEN WHERE IT
        FRAUDULENTLY CONDUCTED BUSINESS WITH CUSTOMERS WITH THE
        INTENTION NOT TO MAKE PAYMENT TO PHYSICAL SUPPLIER .................17

   D.   THE ENGLISH OMNIBUS SECURITY AGREEMENT DOES NOT ASSIGN A
        MARITIME LIEN BY ITS TERMS UNDER ENGLISH LAW ...........................19

        1.   ING Has the Burden to Show the Parties' Clear Intent to Assign a
             U.S. Maritime Lien Right ......................................................20

        2.   The Buyer's Contractual Obligations under the O.W. Bunker Terms
             and Conditions Are Not Enforceable Against the Vessels .......................22

        3.   The Security Agreement Does Not Expressly Assign a Maritime Lien
             Right ...................................................................................24

        4.   The Security Agreement Does Not Implicitly Assign a U.S. Maritime
             Lien Right ...........................................................................28

        3.   The Settlement Agreement Executed by O.W. Switzerland Does not
             Cure any Defect in the Assignment – it Merely Gives up O.W.
             Switzerland's Liquidator's Independent Right to Assert Claims .............31

V.     CONCLUSION ..........................................................................................32

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A/S Dan Bunkering Ltd. v. M/V Zamet,*
   945 F.Supp. 1576 (S.D. Ga. 1996) ..................................................................................15

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................................12

*Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty,*
   608 F.2d 197 (5th Cir. 1979) ..........................................................................................16

*Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner,*
   724 F.2d 1161 (5th Cir. Tex. 1984) ................................................................................24

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ........................................................................................................12

*Citibank (North Dakota), N.A. v. Martin,*
   807 N.Y. S. 2d 284 (N.Y. City Civ. Ct. 2005) ...............................................................20

*Custom Fuel Services, Inc. v. Lombas Industries, Inc.,*
   805 F.2d 561 (5th Cir. 1986) ..........................................................................................15

*D'Antonio v. Metro. Transp. Auth.,*
   No. 06-4283, 2008 U.S. Dist. LEXIS 16726 (S.D.N.Y. Mar. 4, 2008) ...........................23

*Exxon Corp. v. Central Gulf Lines, Inc.,*
   780 F. Supp. 191 (S.D.N.Y. 1991) .................................................................................15

*Galehead, Inc. v. M/V Anglia,*
   183 F.3d 1242 (11th Cir. 1999) ......................................................................................15

*Great Lakes Business Trust v. M/T Orange Sun,*
   855 F. Supp. 2d 131 (S.D.N.Y. 2012) ............................................................................15

*Gulf Trading & Transp. Co. v. M/V Tento,*
   694 F.2d 1191 (9th Cir. 1982) ........................................................................................16

*L&L Oil Co., Inc. v. M/V Rebel,*
   96 F.3d 1445 (5th Cir. 1996) .....................................................................................21, 22

*Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV,*
   199 F.3d 220 (5th Cir. 1991) ..........................................................................................14

*M.S.S. v. Century Sur. Co.*,
    No. 15-2801, 2015 U.S. Dist. LEXIS 146517 (S.D.N.Y. Oct. 28, 2015) ...............................23

*MBIA Ins. Corp. v. Royal Bank of Can.*,
    706 F. Supp. 2d 380 (S.D.N.Y. 2009)........................................................................................23

*McCarthy v. Am. Int'l Group, Inc.*,
    283 F.3d 121 (2d Cir. 2002).............................................................................................25, 31

*North End Oil, Ltd. v. M/V Ocean Confidence*,
    777 F. Supp. 12 (C.D. Cal. 1991) .............................................................................................26

*O'Rourke Maritime Services L.P., L.L.P. v. M/V Costco Haifa et al*,
    Case No. 15-cv-2992, Dkt. No. 79 (S.D.N.Y. Apr. 16, 2016)(SAS)......................................30

*In re O.W. Bunker Holding North America Inc.,et al.*,
    Case No. 14-51720 (Bankr. D. Conn.).......................................................................................4

*Quadrant Structured Prods. Co., Ltd. v Vertin*,
    23 N.Y.3d 549 (N.Y. 2014) .............................................................................................25, 31

*Valero Mktg. and Supply Co. v. M/V ALMI SUN, IMO No. 9579535*,
    No. 14-2712, 2015 WL 428217 (E.D. La. Dec. 28, 2015) ......................................................30

*Vaughn v. Atkinson*,
    369 U.S. 527 (1962).................................................................................................................15

**Statutes**

46 U.S.C. §§ 31303 *et seq*.............................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 56...........................................................................................................12, 19, 32

Fed. R. Civ. P. Supplemental Admiralty Rule C. .........................................................8, 9, 10, 11

Fed. R. Civ. P. Supplemental Admiralty Rule E(8)...................................................................10

## I.      PRELIMINARY STATEMENT

Defendants *in rem* in the above-captioned actions, the M/V Temara, M/V Voge Fiesta, M/V Ocean Harmony and M/V Maritime King ("Defendants" or the "Vessels") hereby submit the following joint Memorandum of Law in Opposition to ING Bank N.V's ("ING") Motions for Partial Summary Judgment filed in each case regarding the validity of its purported maritime lien and the assignment of a maritime lien to ING pursuant to a Security Agreement governed by English law ("ING's Motion").  Also filed concurrently herewith in opposition to ING's Motion are the Declaration of Christopher Hancock QC ("Hancock Decl."), the Declaration of James H. Power (in cases 16-cv-95, 16-cv-2051, 16-cv-3456) ("Power Decl.") and the Declaration of Andrea Pincus (in case 16-cv-2923) ("Pincus Decl.") and the exhibits attached thereto.

ING has failed to meet its burden which would allow this Court to enter summary judgment in its favor.  As a matter of law, ING's assignors (various O.W. Bunker entities defined below) did not meet the requirement under U.S. law to acquire a U.S. maritime lien for the supply of necessaries, where O.W. Bunker did not make the required underlying payment to the physical suppliers who actually made the delivery of fuel.  Accordingly, although O.W. Bunker received orders for bunkers from its customers and subsequently subcontracted the actual supply to third-parties, it did not "provide" or "furnish" necessaries pursuant to the Commercial Instruments and Maritime Lien Act.  Even if O.W. Bunker did acquire a maritime lien under U.S. law, no maritime lien was assigned by O.W. Bunker to ING by its Security Agreement (defined below), which is governed by English law (which does not recognize the validity of a maritime lien), and which does not expressly or implicitly assign a U.S. maritime lien anywhere in the contract.  Additionally, there are substantial issues of material fact which require discovery as to certain additional defenses to O.W. Bunker's purported maritime lien against the relevant Vessels, including equitable defenses based on O.W. Bunker's unclean hands and substantial

1

fraud within the organization prior to and at the time of contracting with the Vessels' charterers. Finally, to the extent the Court is not able to make a determination that the Security Agreement by its terms did not assign any maritime lien to ING, further discovery would assist in interpreting the contract based on the intent of the parties (ING and O.W. Bunker).

## II.    PROCEDURAL BACKGROUND

Each of the above-captioned cases was initiated by ING in another U.S. District Court in which District the respective vessel was due to arrive or in fact did arrive and was arrested pursuant to Supplemental Admiralty Rule C by ING to obtain security for ING's alleged maritime lien  as a purported assignee of either O.W. Bunker & Trading A/S ("O.W. Denmark"), O.W. Bunker (Switzerland) SA ("O.W. Switzerland) or O.W. Bunker (UK) Limited ("O.W. UK") (O.W. Denmark, O.W. Switzerland, and O.W. UK, are referred to collectively herein as "O.W. Bunker").  In each case, the respective vessel owner or charterer has filed a restricted appearance to defend against ING's claims against the vessels, which are purely *in rem* and which consist of a maritime lien claim for payment related to the delivery of bunker fuel, which ING alleges are "necessaries" pursuant to the Commercial Instrument and Maritime Liens Act, 46 U.S.C. §§ 31303 *et seq.* (the "CIMLA").  ING alleges the existence of a maritime lien as assignee of the O.W. Bunker contract suppliers.

Each of these cases was subsequently transferred to the Southern District of New York pursuant to the O.W. Bunker Group Terms and Conditions of Sale for Marine Bunkers (Edition 2013) (the "O.W. Terms and Conditions") which provide for (among other things) the determination of the existence of a maritime lien pursuant to U.S. maritime law and the adjudication in this District of all claims arising in connection with a maritime lien asserted against a vessel.  The cases have been marked related, and overlapping legal issues are being adjudicated on a coordinated schedule.  Pursuant to this Court's order dated June 21, 2016 (16-

cv-95, Dkt. 137)[1], on July 29, 2016 ING filed a Motion for Partial Summary Judgment in each case with respect to the validity of its alleged maritime liens, including the underlying maritime liens of its assignor, O.W. Bunker, as well as the validity of its purported assignment as governed by English law pursuant to the Omnibus Security Agreement dated December 19, 2013 between O.W. Denmark and its subsidiaries, and ING as Security Agent (the "Security Agreement").[2]

## III. UNCONTESTED MATERIAL FACTS

### A. The Assignment

Pursuant to the Security Agreement, the O.W. entities have allegedly assigned certain rights in respect of their fuel supply contracts as security to ING.  The Security Agreement was drafted by ING in connection with a certain 19 December 2013 $700 million multicurrency revolving borrowing base facilities agreement from ING and certain other banks to the O.W. Bunker entities (the "Credit Agreement").  *See*, Security Agreement at p. 4.  The Security Agreement provides, in relevant part, that various O.W. entities assign to ING all "rights, title and interest in respect of... the Supply Receivables" (Clause 2.3 of the Security Agreement), which are defined as amounts owing, or to be owed, to an O.W. entity under a "Supply Contract."  "Supply Contract" is in turn defined as, "any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case governed by English law . . ." (Security Agreement, Clause 1.1).  The Security Agreement, which is governed by English law, does not anywhere mention maritime liens or maritime lien rights or assignment of maritime liens.

---

[1] For ease of reference, unless otherwise noted, ING's motion papers which were filed in each of the above-captioned actions will be cited herein with reference to the Docket Numbers in the *Temara* case, No. 16-cv-95.

[2] The Security Agreement is attached to the ING 56.1 Statements in the Temara case as Exhibit 2 (Watson Declaration) at Exhibit B, 16-cv-95 Dkt. 144-3; it is also found in the Ocean Harmony case at 16-cv-2923, Dkt. 58-3,

Although ING asserts its rights to pursue maritime claims against the Vessels  on behalf of parent company O.W. Denmark as well as certain other subsidiaries, it fails to mention anywhere in its pleadings that O.W. Denmark itself is currently challenging the validity of ING's assignment under Security Agreement in the Danish bankruptcy proceeding.   An article appearing in a Danish maritime trade paper, Shipping Watch, entitled "OW liquidator aims to strip bank of the rights to huge claims," (Power Decl., Ex. 4) notes that ING's rights could be invalidated in the Danish proceedings.  It is likely that ING's rights with respect to the various O.W. Bunker entities will need to be independently determined in the home country of each entity, through the respective liquidation proceedings.  Indeed, several other ING entities are also challenging ING's rights, including the Norwegian entity Bergen Bunkers, as well O.W. Bunker Germany GmbH, who has filed a Chapter 15 proceeding in the Southern District of New York (Case No. 15-13018) and is fighting ING's right to payment in various interpleader actions in the SDNY (*E.g., Bonny Gas Transport Limited v. O.W. Bunker Germany GmbH, et al.*, Case No. 14-cv-9542)(S.D.N.Y.)(VEC)).[3]

## B.      The O.W. Bunker Bankruptcy and the Fraudulent and Reckless Acts of Management

On November 7, 2014, O.W. Denmark and certain of its Danish subsidiaries and affiliates filed for bankruptcy in their home jurisdiction of Denmark.  Thereafter many other O.W. entities and/or affiliates filed for bankruptcy, liquidation or similar proceedings in various other jurisdictions around the world, or simply ceased operations.  No foreign O.W. Bunker

---

[3] The U.S. debtors, O.W. Bunker USA Inc, O.W. Bunker North America Inc., and O.W Bunker Holdings North America Inc. also challenged ING's right to collect receivables on their behalves pursuant to the Security Agreement, but those challenges were settled in the context of the Chapter 11 proceeding. "Although the Debtors and the Committee believe that the avoidance action against ING Bank['s Liens] would be successful, the Debtors' Estates may lack the resources necessary to pursue the litigation…" *In re O.W. Bunker Holding North America Inc.,et al.*,  Case No. 14-51720 (Bankr. D. Conn.) (Dkt. 1089 at 9).

entity bankruptcy proceeding has been recognized in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

In connection with the Danish bankruptcy proceeding, the lawyers Pernille Bigaard of Plesner and John Sommer Schmidt of Gorrissen Federspiel were appointed trustees of the bankruptcy estates of the Danish group of companies. On December 3, 2014, Søren Halling-Overgaard was appointed *ad hoc* trustee for the purpose of investigating the possible existence of legal liability on the part of the respective bankruptcy estates, including investigation and examination of reports, accounting records, correspondence, business process descriptions and policies of the O.W. Bunker entities and their management and board of directors. Power Decl. Ex. 1 at 3. The Report, issued by the law firm Halling-Overgaard, Sølvkaer Olesen, Henriksen, entitled "Report to the creditors in the bankruptcy estates of the O.W. Bunker Group concerning investigations into possible legal liability" (hereinafter the "Report") was released in December 2015 in Danish and has also been translated into English. Power Decl., ¶ 2; Pincus Decl., ¶ 2.

The Report concluded that O.W. Denmark's board and management held actionable knowledge that could have enabled O.W. Denmark and its subsidiaries to avoid bankruptcy and collapse. This included insufficient, inadequate and irresponsible business procedures, and inattention to the evolving situation concerning the oil derivatives trading in which it was engaged. Power Decl., Ex. 1; Pincus Decl., Ex. 1.

Once the credit situation reached a critical level, as one of the company's responses to the lack of credit available due to significant losses caused by fraud perpetrated by affiliate Dynamic Oil Trading ("DOT") as well as derivative trading losses, O.W. Denmark and its subsidiaries were to suspend or defer payments owed to physical suppliers. Power Decl, Ex. 1 at 390; Pincus Decl, Ex. 1 at 390. Despite O.W. Denmark's intention to cease payment to its and its

subsidiaries' contractual counterparties beginning as early as October 15, 2014, the O.W. Bunker entities continued to contract with innocent customers for the supply of marine bunkers with no intention of satisfying the underlying physical supplier contracts. It was only on November 5, 2014 that O.W. Denmark finally issued a "stop-trade" order to its subsidiaries. Power Decl., Ex. 3 (Tolson Depo.) at 158:18-25; Pincus Decl., Ex. 3 at 158:18-25. Significantly, bunkers were delivered to each of the vessels in the above-captioned actions during that period, between October 15, 2014 and November 5, 2014.

Overall, the Report concluded that the board's actions throughout the deteriorating economic situation of O.W. Bunker were "reprehensible" and contributed to the significant losses of the company which could have otherwise been avoided. Power Decl., Ex. 1 at 381-82, 398; Pincus Decl., Ex. 1 at 381-82, 398. The results of the Report are discussed further in Point IV.C., below.

Based on the materials reviewed and the findings of the report, additional charges are likely to be filed in the near term against O.W. Bunker Group board members. *See* Power Decl., Ex. 5; *see also*, Pincus Decl., Ex. 5. Indictments for fraud were already issued in March 2016 against O.W. Denmark CEO Jim Pedersen, O.W. Denmark former CFO Morten Skou, and former CEO of DOT Lars Moller. *Id.* The fraud charges against these three individuals are linked to a fake bunker contract with the Italian Navy worth $50 million. *Id.*

### C. The Transactions

#### 1. M/V Temara

On or about August 29, 2014 Cimpship Transportes Maritimos S.A. ("Cimpship") as owner of the vessel M/V Temara, entered into a time charter party with Copenship Bulkers A/S ("Copenship") for use of the Temara. On or about October 9, 2015 Copenship, as charterer, allegedly ordered bunkers to be delivered to the Temara in Panama from O.W. Bunker &

Trading A/S ("O.W. Denmark").  The bunkers were to be delivered to the vessel pursuant to the Sales Order Confirmation, which incorporated the O.W. Bunker Terms and Conditions. 16-cv-95, Dkt 1.  O.W. Denmark, in turn, through O.W. Bunker USA, Inc. ("O.W. USA"),[4] contracted with CEPSA Panama, S.A. ("CEPSA") to deliver the bunkers to the vessel.  O.W. Denmark issued an invoice for the supply of marine fuel to the vessel in the amount of $221,812.95.  16-cv-95, Dkt 1-5.  Neither O.W. Denmark nor plaintiff ING has paid CEPSA for the fuel delivery.

In February 2015 Copenship filed for bankruptcy in Denmark, leaving many of its counterparties unpaid.  Cimpship as owner of the Temara had no knowledge of any alleged outstanding debt of Copenship to O.W. Denmark or the debts of O.W. Denmark or O.W. USA to CEPSA until May 22, 2015, when it received a notification of outstanding invoice from O.W. Denmark and the threat of arrest if the invoice was not settled that same day.  Further, there is a substantial question of fact as to whether Copenship has actually paid O.W. Denmark and/or ING for this invoice.  According to trade press, the Copenship bankruptcy estate is currently seeking to reclaim amounts that it paid to O.W. Denmark at the time it was insolvent.  Power Decl., Ex. 6.  According to the article, these amounts have been transferred from the O.W. Denmark estate to ING.  *Id.*  If ING has in fact been paid by Copenship, any lien it purports to have against the M/V Temara has been extinguished.

On May 22, 2015 ING, acting as alleged assignee of certain rights of O.W. Denmark, filed an arrest action against the vessel, asserting a maritime claim for its unpaid invoice in connection with fuel delivery made to the vessel (the "Temara Fuel Delivery").  16-cv-95, Dkt. 1.  CEPSA as physical supplier intervened in the action that same day, also asserting a maritime

_____

[4] On or about November 13, 2014, O.W. USA, O.W. Bunker North America Inc. and O.W. Bunker Holding North America Inc. (collectively, the "Debtors") all filed voluntary petitions pursuant to Chapter 11 in the United States Bankruptcy Court for the District of Connecticut as Case Nos. 14-51720, 14-51721 and 14-51722.

lien claim for the same Temara Fuel Delivery.  16-cv-95, Dkt. 13.  CEPSA's claim has since been dismissed by this Court. 16-cv-95, Dkt. 152.

In addition, ING filed a Motion for Issuance of Warrant of Arrest of the Vessel pursuant to Supplemental Admiralty Rule C.  16-cv-95, Dkt. 2.  On the same date, the U.S. District Court for the District of Maryland issued an order for the writ of arrest of the M/V Temara, and the vessel was subsequently arrested.  16-cv-95, Dkts. 9, 11, 19.  The Temara case was subsequently transferred to this Court on January 22, 2016.  16-cv-95, Dkts. 93, 94.

### 2.    M/V Voge Fiesta

In October 2014, Primetransport Ltd., as charterer of the vessel M/V Voge Fiesta, allegedly ordered bunkers from O.W. Denmark for provision to the vessel in Singapore.  16-cv-2051, Dkt. 1.  The bunkers were to be delivered to the vessel pursuant to the Sales Order Confirmation, which incorporated the O.W. Terms and Conditions.  16-cv-2051, Dkt. 1-1 (Exs. A, B).

The marine fuel oil was delivered on behalf of O.W. Denmark by various third-party entities, or physical suppliers, including Cathay Marine Fuel Oil Trading Pte. Ltd. and Impex Marine (S) Pte Ltd.  16-cv-2051, Dkt. 1-1 (Ex. C).  These physical suppliers have not been paid by O.W. Denmark or plaintiff ING and have competing maritime claims in relation to the subject fuel delivery.  O.W. Denmark issued an invoice for the supply of marine fuel to the vessel in the amount of $171,318.32.  16-cv-2051, Dkt. 1-1 (Ex. D).

On December 2, 2015 ING, acting as alleged assignee of certain rights of O.W. Denmark filed a Verified Complaint against the Vessel, asserting a maritime claim for unpaid invoice in connection with fuel delivery made to the vessel (the "Voge Fiesta Fuel Delivery").  In addition, ING filed a Motion for Issuance of Warrant of Arrest of the Vessel pursuant to Supplemental Admiralty Rule C.  16-cv-2051, Dkt. 2.  On the same date, the U.S. District Court for the

Southern District of Texas issued an order for the writ of arrest of the M/V Voge Fiesta, and the vessel was subsequently arrested. 16-cv-2051, Dkts. 6, 14, 15. The Voge Fiesta case was subsequently transferred to this Court on March 21, 2016. 16-cv-2051, Dkt. 23.

### 3.   M/V Ocean Harmony

On or about October 2, 2014, Bulk Atlantic Inc. ("BAI") entered into a time charter (the "Charter Party") for use of the vessel the M/V Ocean Harmony ("Ocean Harmony").[5] Clause 18 of the Charter Party provides that the charterer, BAI, "will not suffer, nor permit, to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the titles and interest of the owners in the vessel." *Id.* Clause 76 provides that, "In no event will Charterers procure or permit to be procured any supplies, necessities or services on the credit of the vessel." *Id.*

On or about October 13 2014, BAI, as charterer of the Ocean Harmony, allegedly contracted with O.W. UK for delivery of bunkers to the Ocean Harmony in Piraeus, Greece. 16-Civ.-2923 Dkt. 1. O.W. UK in turn contracted with O.W. Bunker Malta Ltd – OWB Piraeus SC ("O.W. Malta") to supply the vessel. 16-cv-2923 Dkt. 52-2 at 5. O.W. UK and/or O.W. Malta thereafter subcontracted with a third-party physical supplier EKO for the delivery of the fuel to the vessel in Greece ("Ocean Harmony Fuel Delivery"). *Id.* The bunkers allegedly were to be delivered to the vessel pursuant to the October 31, 2014 Sales Order Confirmation, which incorporated the O.W. Terms & Conditions. 16-Civ.-2923 Dkt. 1-1, 1-2. The bunkers, however, apparently were delivered to the vessel by third party physical supplier SEKA S.A. on or about October 31, 2014. 16-cv-2923 Dkt. 52-2 at 5. Dated the same date is an invoice issued by O.W. UK to BAI for the supply of marine fuel to the vessel in the amount of $379,718.00. SEKA has

---

[5] A copy of the Charter Party is attached as Exhibit 6 to the Declaration of Andrea Pincus dated September 15, 2016 (the "Pincus Declaration"), filed herewith in Case No. 16-cv-2923.

not been paid by O.W. UK or plaintiff ING and has a competing claim to payment in relation to the Ocean Harmony Fuel Delivery which it is pursuing through a pending action commenced in Greece.[6]

On February 26, 2016 ING, acting as alleged assignee of certain rights of O.W. UK filed a Verified Complaint against the vessel *in rem* in the U.S. District Court for the District of Maryland, asserting a maritime lien for an unpaid invoice in connection with the Ocean Harmony Fuel Delivery. 16-Civ.-2923 Dkt. 1. ING filed a Motion for Issuance of Warrant of Arrest of the vessel pursuant to Supplemental Admiralty Rule C. 16-Civ.-2923 Dkts. 3, 4. On the same date, the U.S. District Court for the District of Maryland issued an order for the writ of arrest of the vessel, which was subsequently arrested. 16-Civ.-2923 Dkts. 6, 7, 8, 9. Ocean Harmony Maritime Inc. ("Ocean Harmony") filed a statement of interest as owner of the defendant vessel M/V OCEAN HARMONY *in rem* and a restricted appearance in accordance with Supplemental Admiralty Rules C and E(8). 16-Civ.-2923 Dkts. 17, 18. Following the deposit of substitute security by Ocean Harmony[7] and release of the vessel, the Ocean Harmony case was transferred to this Court on April 19, 2016. 16-Civ.-2923 Dkt. 37.

### 4. M/V Maritime King

On October 29, 2014, CLdN Cobelfret S.A. ("Cobelfret"), as charterer of the vessel M/V Maritime King, ordered bunkers from O.W. Bunker (Switzerland) AS ("O.W. Switzerland") for provision to the vessel in India. 16-cv-3456, Dkt. 1. The bunkers were to be delivered to the Vessel pursuant to the Sales Order Confirmation, which incorporated the O.W. Terms and Conditions. 16-cv-3456, Dkt. 1-1, 1-2. O.W. Switzerland thereafter contracted with its

---

[6] Seka S.A., has already commenced an action against Ocean Harmony Shipping & Management Co., LTD on September 2015, in Piraeus, Greece, claiming a right to payment as the physical supplier of the same fuel delivered to the Vessel; the action remains pending.

[7] Defendant Ocean Harmony's motion to reduce the amount of substitute security is currently pending before this Court, 16-cv-2923 Dkt. 54.

subsidiary or affiliate, O.W. Bunker Middle East DMCC ("O.W. India"), who in turn contracted with a third-party physical supplier, intervening Plaintiff Chemoil Adani Private Limited ("Chemoil Adani"). Chemoil Adani delivered the marine fuel oil to the vessel on November 5, 2014.[8] 16-cv-3456, Dkt. 1-3. O.W. Switzerland issued an invoice on November 5, 2014 to Cobelfret for the supply of marine fuel to the Vessel in the amount of $136,747.27. 16-cv-3456, Dkt. 1-4. Chemoil Adani has not been paid by O.W. Switzerland, O.W. India or plaintiff ING and has a competing maritime lien claim in relation to the subject fuel delivery.[9]

On November 27, 2015 ING, acting as alleged assignee of certain rights of O.W. Switzerland filed a Verified Complaint against the Vessel in the U.S. District Court for the District of Maryland, asserting a maritime lien for an unpaid invoice in connection with a fuel delivery made to the Vessel (the "Maritime King Fuel Delivery"). 16-cv-3456, Dkt. 1. ING filed a Motion for Issuance of Warrant of Arrest of the Vessel pursuant to Supplemental Admiralty Rule C. 16-cv-3456, Dkt. 2. On the same date, the U.S. District Court for the District of Maryland issued an order for the writ of arrest of the Vessel, which was subsequently arrested. 16-cv-3456, Dkts. 4, 6, 14. Following the deposit of substitute security and release of the vessel, the Maritime King case was transferred to this Court on May 10, 2016. 16-cv-3456, Dkt. 50.

## IV.    LAW AND ANALYSIS

### A.    Standard of Review

---

[8] Interestingly, November 5, 2014 was the same day that a stop-trading order was issued by O.W. Denmark to its subsidiaries to prevent further damages caused by the imminent collapse. Tolson Decl. (Power Decl. Ex. 3) at 158-159.

[9] Chemoil Adani filed an Emergency Motion to Intervene on December 2, 2016 (16-cv-3456, Dkts. 12, 13), and has asserted a Rule C maritime lien claim for payment of its invoice in the amount of $134,497.31 (16-cv-345, Dkt. 43). This Court has not ruled on Chemoil Adani's claim as a physical supplier, but Cobelfret suggests that the Court's August 24, 2016 ruling in the Temara case against CEPSA (16-cv-95, Dkt. 152) would suggest a similar result with respect to Chemoil Adani's maritime lien claim.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once the moving party meets this initial burden, however, the non-moving party must go beyond the pleadings and by its own evidence demonstrate that there is a genuine issue of fact for trial. *See Celotex*, 477 U.S. at 323. If the non-moving party fails to make such a showing, then the moving party is "entitled to a judgment as a matter of law." *Id.* at 322; Fed. R. Civ. P. 56(e). ING has not met its burden with respect to either the validity of the underlying maritime lien or the assignment of any such lien to ING, and the motion for summary judgment should be denied.

### B. O.W. Bunker Did Not Acquire a Maritime Lien Under the CIMLA Where it Failed to "Provide" Necessaries to the Vessels by Failing to Pay its Subcontracting Physical Supplier for Each Fuel Delivery

It is undisputed by the parties that the CIMLA[10] governs U.S. lien rights for the provision of necessaries (ie, fuel bunkers) to the vessels, in accordance with the O.W. Terms and Conditions at clause P.5. ING Br. (16-cv-95, Dkt. 147) at 10, 19.[11] Specifically, clause P.5 reads,

> The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert its rights of lien or attachment or other rights,

---

[10] ING refers to the Act as the "FMLA" (Federal Maritime Lien Act). Congress recodified the FMLA in 1988 as part of the Commercial Instruments and Maritime Lien Act (CIMLA) but did not make any substantive changes. Relevant caselaw use the acronyms interchangeably, but most recent caselaw refers to the act as CIMLA.

[11] For comparable citation to the ING moving brief filed in the Ocean Harmony case, please see 16-cv-2923, Dkt. 57.

whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

ING 56.1 Statement, Ex. 1 at Ex B (16-cv-95, Dkt. 144-2 at 21-22).[12]  Accordingly, the question of whether the relevant contracting O.W. Bunker entity (O.W., UK, O.W. Switzerland or O.W. Denmark)[13] possesses a maritime lien and *in rem* claim against the relevant vessel turns entirely on whether the statutory requirements stated in 46 U.S.C. §31342 are satisfied.  The CIMLA provides in relevant part as follows:

> (a) Except as provided in subsection (b) of this section, a person ***providing necessaries*** to a vessel on the order of the owner or a person authorized by the owner-
>
> > (1) has a maritime lien on the vessel;
> >
> > (2) may bring a civil action *in rem* to enforce the lien; and
> >
> > (3) is not required to allege or prove in the action that credit was given to the vessel.

*Id.* (Emphasis added).  For a maritime lien to exist under the CIMLA, the claimant must have (a) provided necessaries (b) to a vessel (c) on the order of the owner or a person authorized by the owner.  The Defendants here do not contest that the charterers of each vessel were authorized by the owners to purchase bunkers for the Vessels pursuant to each charter party.  As noted recently by this Court, however, maritime liens are "disfavored in the law and its requisites are construed *stricti juris* by the court." (16-cv-95, Dkt. 152 at 19) (citation omitted).

The crux of ING's argument is that "O.W. Bunker, through the physical suppliers… supplied bunkers to the [Vessel], and thereby has a maritime lien against the Vessel."  (16-cv-

---

[12] For the comparable citation to the ING 56.1 Statement filed in the Ocean Harmony case, please see 16-cv-2923, Dkt. 58.

[13] To the extent ING asserts claims as an assignee of any intermediary O.W. Bunker entity (such as O.W. India, with respect to the M/V Maritime King or O.W. Malta with respect to the M.V Ocean Harmony), the analysis would also take place under CIMLA.  However, the analysis would be even more attenuated where O.W. India or O.W. Malta itself did not contract directly with the charterer, but instead with another O.W. entity.

3456 at 21).  However, O.W. Bunker did not "provide" or otherwise supply anything where it did not pay the physical suppliers (such as CEPSA, Chemoil Adani, SEKA, or Cathay) for the bunkers delivered.  O.W. Bunker merely caused each of the physical suppliers themselves to deliver bunkers, and by failing to pay, inequitably put the Vessels and their owners and charterers in a position where they face competing claims for payment for the fuel delivered. Indeed, no service was actually provided by O.W. Bunker pursuant to the contract, which contained an implied agreement to arrange for delivery of bunkers without incurring excess potential liability to the vessel through O.W. Bunker's own breach of contract.  Although there is limited legal precedent or legislative history concerning  what is meant by "providing" or "furnishing" necessaries in this context, there is certainly nothing in the history of CIMLA, or subsequent case law to suggest that an entity can create a contract which it does not (and never intended) to honor, fail to make the required underlying payments, and then obtain the benefit of a maritime lien which is a remedy created in admiralty law to protect honest suppliers of bunkers and other necessaries.

A review of the case law involving the assertion of a maritime lien by contractual or physical suppliers indicates that courts consider necessaries to have been "provided" or "supplied" by a physical supplier, who has actually delivered to a vessel.  *See Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 225 (5th Cir. 1991) ("It is undisputed that stevedoring services are necessaries, and that LCS [as physical supplier] provided those services").[14]  Although a party need not be a physical supplier in order to be

---

[14] Defendants submit that under the circumstances, it was the physical suppliers who "provided" necessaries to the vessels, albeit not on the authority of a person authorized to bind the vessels (thus preventing physical suppliers from receiving a maritime lien directly against the vessels).  Under the equity principles of admiralty, any payment due to O.W. Bunker pursuant to contract (on an *in personam* basis only) by the Vessels' charterers would be subject to any claims the physical suppliers may have against O.W. Bunker (and/or ING) in each entity's respective bankruptcy.

considered a supplier of necessaries, this is **only** true where the contract supplier has paid its underlying subcontractor. *See Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1245 (11th Cir. 1999) (energy services corporation *that paid for fuel bunkers* supplied to vessel, "provided" necessaries as required to be entitled to maritime lien, even though corporation did not physically supply the bunkers); *Exxon Corp. v. Central Gulf Lines, Inc.*, 780 F. Supp. 191 (S.D.N.Y. 1991) (contractual fuel supplier "arranged" to have fuel bunkers delivered to vessel by local company, *paid invoice* issued to it by local supplier, and was entitled to a maritime lien under the FMLA (now CIMLA)); *A/S Dan Bunkering Ltd. v. M/V Zamet,* 945 F.Supp. 1576 (S.D. Ga. 1996) (same). The requirement to pay its physical supplier is not extinguished by the O.W. Bunker bankruptcies. Here, ING seeks to recover the funds pursuant to a maritime necessaries lien outside of the relevant bankruptcy proceedings, and as discussed below, O.W. Bunker engaged in these transactions on the eve of bankruptcy with the bad faith intent not to pay the physical suppliers.[15]

A maritime lien for necessaries is an equitable remedy, a procedure designed to protect bunker providers who pay their subcontractors in the usual course of business. There is no question that this Court, sitting in admiralty, possesses equitable powers and can "award what is fair to avoid injustice. *See e.g., Great Lakes Business Trust v. M/T Orange Sun*, 855 F. Supp. 2d 131, 146 (S.D.N.Y. 2012); *see also Vaughn v. Atkinson*, 369 U.S. 527, 530 (1962) ("Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief."); *Custom Fuel Services, Inc. v. Lombas Industries, Inc.*, 805 F.2d 561 (5th Cir. 1986) ("The power of an

---

[15] These acts may have been done with the knowledge and consent of ING, who had an interest in having O.W. Bunker continue to invoice charterers in early October and November 2014 despite being insolvent, in the hopes of having funds deposited into the O.W. Bunker bank accounts at ING Bank, with the knowledge that the invoices for third-party fuel suppliers who contracted with O.W. Bunker would not be paid. This is an issue requiring discovery in these cases.

admiralty court to scrutinize the underlying validity of liens and mortgage claims is of ancient origin and derives from the court's historic equity jurisdiction.").

It would be inequitable here to allow O.W. Bunker (or any assignee thereof) the right to collect payment directly against the vessels which it does not intend to use to extinguish supplier claims down the contractual chain.  To allow such mechanisms of recovery would allow bunker brokers to perpetrate mass fraud by setting up bunker supply contractual chains which they never intend to honor, meanwhile collecting payment *in rem* against a vessel.  In *Gulf Trading & Transp. Co. v. M/V Tento*, 694 F.2d 1191 (9th Cir. 1982), the court acknowledged that legislative history of the CIMLA was concerned with which party was to suffer a loss relating to the provision of necessaries when the "materialman [] furnishes such necessaries in ***good faith***." *Id.* at 1194 (citing H.R. Rep. No; 92-340, 92nd Cong., l51 Sess. 1, 3, reprinted in [1971] U.S. Code Cong. & Ad. News 1363, 1365) (emphasis added).  In each O.W. Bunker case, the physical supplier's invoice for the fuel delivered to the vessels totals an amount which is several thousand dollars less than O.W. Bunker's invoice for the same fuel delivered to the vessels.  Had O.W. Bunker paid each physical supplier for the fuel delivered, O.W. Bunker would have earned only a small profit margin on the fuel.  ING was no doubt aware of O.W. Bunker's role in these transactions.  Instead, ING asserts that O.W. Bunker (and therefore, ING) is entitled to the entire amount of the O.W. Bunker invoice without paying the underlying amount due to the physical supplier.  "Whether a [federal maritime necessaries] lien is available must be determined by a fair consideration of the totality of the circumstances." *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 202 (5th Cir. 1979).  Based on the totality of the circumstances here, as well as the equities applicable in admiralty, O.W. Bunker's failure to make payment to the underlying physical suppliers, and bad faith acts with respect to the contracting for the supply

of fuel with its customers in Q3 2014, particularly in October and November or 2014 when O.W. Bunker was insolvent (as discussed further below), merit the denial of a maritime lien to O.W. Bunker in the first instance for the fuel delivery under the CIMLA.

### C.   O.W. Bunker Did Not Acquire a Maritime Lien Where it Fraudulently Conducted Business With Customers with the Intention Not to Make Payment to Physical Supplier

As set forth above, in connection with the bankruptcy of O.W. Denmark, a report was prepared by Søren Halling-Overgaard, a trustee in O.W. Denmark's bankruptcy proceedings to the creditors in the Danish bankruptcy (the "Report"). The Report concludes that the now defunct company's management held actionable knowledge that could have enabled O.W. Denmark and its subsidiaries to avoid bankruptcy and collapse. Specifically, the Report found that on or about October 20, 2014, O.W. Denmark board minutes reflect an urgent liquidity situation, and that certain short-term measures were implemented, including "deferment of payments to suppliers." Power Decl., Ex. 1 at 390; Pincus Decl., Ex. 1 at 390. The situation was apparently so bad that the O.W. Bunker Group established the "Red October" project, which was a working group comprised of directors, officers, and risk management employees to "handle the critical situation." *Id.* at 392.

The ad-hoc trustee found that "up until around 30 October 2014, the O.W. Bunker group continuously undertook deferment of payments to suppliers involving significant amounts." This continued from October 30, 2014 through OW's bankruptcy. *Id.* at 392. Additionally, the Report notes that various risk positions and losses were "made possible  by insufficient, inadequate and irresponsible business procedures, policies, mandates, etc. in relation to the actual activities and risks within the O.W. Bunker Group." *Id.* at 381.

The trustee also noted that despite this situation, the Q3 company announcements dated October 7, 2014 and October 23, 2014 "did not reflect the actual circumstances." *Id.* at 396.

In its liability assessment, the ad-hoc trustee found that "members of the corporate management, etc, were aware of the dispositions made in Q3 2014 and October 2014 in the O.W. Bunker Group in relation to trading activities (speculation) with oil derivatives, etc., and furthermore withheld significant losses from the quarterly financial statements in respect of Q3 2014." *Id.* at. 398.   The Board members "should have been aware beforehand... [and] should have reacted sooner than they did." *Id.*   The trustee found that the Board's inattention to the evolving situation concerning the oil derivatives and Dynamic Oil Trading ("DOT"), and lack of audit to be "reprehensible" (*Id.* at. 398), and that if certain appropriate actions had been taken that the losses sustained by the bankruptcy estate would have been limited (*Id.* at 400).

Adrian Tolson at the time of the O.W. bankruptcy acted as general manager and Vice President for O.W. Bunker North America.   Mr. Tolson also oversaw day-to-day operations of O.W. Bunker USA Inc. as well as O.W. Bunker Panama S.A.   During Mr. Tolson's deposition in two other O.W Bunker disputes pending in this District (14-cv-10089 (S.D.N.Y.)(VEC) and 15-cv-3988 (S.D.N.Y.)(VEC))[16], Mr. Tolson confirmed that on November 5, 2014 each subsidiary of O.W. Denmark received a "stop-trading order" from the parent company.   Power Decl., Ex. 3 ("Tolson Dep.") at 158:18-25; Pincus Decl., Ex. 3 at 158:18-25.

Mr. Tolson confirmed that although the Board was aware of issues at the latest, by October 2014, he as general manager of three O.W. Bunker subsidiaries currently trading was not made aware of the financial situation of the company.   Tolson Dep. at 166:2-14.   Mr. Tolson confirmed that ***had he known*** of the massive losses incurred by O.W. Denmark, he would ***not*** have continued to engage in transactions that involved obligations to pay third-party fuel suppliers.   "'[I]t's likely I would not have carried on in the normal course of business.   We would have to scale it back immediately, obviously." *Id.* at 166:15-167:19.

---

[16] ING was represented at the Tolson Deposition by its New York counsel, Seward & Kissel, LLP.

The above-mentioned evidence is sufficient to raise a genuine issue of material fact which prevents ING from obtaining summary judgment with respect to its alleged maritime lien. Many inferences can be drawn from the initial investigations into the actions of O.W. Denmark and its subsidiaries, including that O.W. Bunker and its management acted fraudulently, recklessly, and negligently such that it should be denied a maritime lien under the CIMLA, and by consequence have no lien to assign to ING.[17] At the very least, Defendants request that this Court order discovery in this action pursuant to Fed. R. Civ. P. 56(d), as additional facts to support its affirmative defense of "unclean hands" are unavailable to Defendants as the non-movants.

### D.    The English Omnibus Security Agreement Does Not Assign a Maritime Lien by its Terms Under English Law

Even assuming *arguendo* that ING can meet its burden to demonstrate that the respective O.W. Bunker entities in these cases acquired valid maritime liens under the CIMLA as a result of the supply of marine fuel bunkers to the Vessels, ING fails to meet its burden for summary judgment on the valid assignment of such liens by O.W. Bunker to ING.  Following the O.W. Bunker collapse in 2014 and almost three years after executing the Security Agreement, ING seeks now to rewrite the terms of the Security Agreement to justify holding vessels hostage and extracting usurious interest and inflated payments from owners and charterers who are merely victims of the O.W. Bunker fraud and collapse, as well as the resulting fight between ING, O.W. Bunker, and physical suppliers for payment. To recoup its losses resulting from poor drafting of the Security Agreement and deficient diligence in the underlying financing transaction, ING relies on its English law expert's creative but strained interpretation of a grammatical construct

---

[17] In addition to and based on the discovery Defendants seek to obtain on these points, Defendants plan to submit a declaration on Danish law that the acts of the O.W. Bunker management in continuing to conduct business during O.W. Bunker's insolvency should void the fuel delivery contracts and may even rise to the level of criminality.

to craft convenient arguments that U.S. maritime liens simply must have been (implicitly) assigned to ING as among the Security Assets.  *See*, Zacaroli Declaration, 16-cv-95, Dkt. 148-3 at ¶¶ 18-21; 16-cv-2923, Dkt. 58-3 at ¶¶ 18-21.

ING tries and fails because the Security Agreement never defines Security Assets to include U.S. maritime liens, never mentions U.S. maritime liens anywhere within the four corners of that document, never transfers U.S. maritime liens expressly or by implication, and because the parties to the Security Agreement contractually agreed to governing law, English law, which does not permit assignment of any maritime liens in the first instance.  As discussed below, ING relies on a flawed and selective application of the rules of construction for an English law agreement in order to support the notion that the Security Assets simply must be read broadly to include specific assets, U.S. maritime liens, which in reality are not subject to the assignment.  As set forth in the Hancock Declaration submitted herewith in support of this Opposition and incorporated herein, under English law the Security Agreement did not assign any maritime liens, either expressly or by implication, and any such assignment would be inconsistent with the context of the Security Agreement taken as a whole as well as inconsistent with English law, which does not permit the assignment of maritime liens.

> **1.    ING Has the Burden to Show the Parties' Clear Intent to Assign a U.S. Maritime Lien Right**

As a preliminary matter, as the party seeking to establish that it has a right to payment in this action, ING bears the legal burden of proof to establish that it is the assignee and real party-in-interest, failing which it cannot succeed on its claim. *See, Citibank (North Dakota), N.A. v. Martin*, 807 N.Y. S. 2d 284, 285-286 (N.Y. City Civ. Ct. 2005) ("[I]t is essential that an assignee show its standing, which doctrine embraces several judicially self-imposed limits on the exercise of jurisdiction, such as the general prohibition on a litigant's raising another person's legal

rights.") (Internal quotations and citations emitted). ING's standing in this matter hinges entirely on the validity and scope of the assignment it claims to have received from O.W. Bunker. If the plain language of the Security Agreement did not, by its terms, assign to ING any U.S. maritime lien claims – which are separate and distinct statutory claims against third parties and vessels and which do not "arise under" any of O.W. Bunker's supply contracts – then ING does not possess those claims and has no standing to assert any such lien claim here. ING bears the burden of proof on this threshold point and it fails to meet that burden.

Whether U.S. law or English law should govern the assignability of maritime liens in these cases itself remains an open question where, as here, the existence of the liens is governed by U.S. maritime law as a carve-out under the O.W. Terms and Conditions (which are otherwise governed by English law), and the Security Agreement, which ING argues assigns the maritime liens, is governed by English law. Clause 21 "Enforcement" of the Security Agreement incorporates Claude 46 ("Enforcement") of the Credit Agreement, which provides in relevant part that disputes between the parties shall be heard either through London arbitration or in English courts. The parties to the Security Agreement and their counsel were presumably aware that English law prohibits assignment of maritime liens; therefore, it is not surprising that the Security Agreement itself, a contract governed by English law and subject to enforcement in an English forum, makes no reference to maritime liens.

To the extent U.S. law governs whether maritime liens arising under U.S. law would be assignable through a Security Agreement governed by English law, U.S. law requires that assignment of a maritime lien must be in writing and that notice to the account debtor of the assignment be provided. "Although maritime liens may be waived or assigned, the Fifth Circuit has insisted upon a strict standard of proof." *L&L Oil Co., Inc. v. M/V Rebel*, 96 F.3d 1445 (5th

Cir. 1996).  "Although the 'formalities of assignment... have not been rigidly defined... assignments must be in writing and notice thereof is to be given to the debtor." *Id.* (citing *Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 630 F.Supp. 630, 634 (D.P.R. 1986); *Vulcan Materials Co. v. Vulica Shipping Co., Ltd.*, 859 F.Supp. 242, 247 (W.D. La. 1994)).  In *L&L Oil*, the court found that it could not infer assignment of a maritime lien on the basis of the wording contained in the bunker receipts or invoices at issue.  Here, the assignment of a maritime lien not only cannot be inferred from bunker receipts, invoices or other bunker transaction documents,[18] but the Security Agreement itself is silent with respect to the assignment of maritime liens.   Further, even where ING has proffered as an uncontested fact that the charterers for the subject vessels were provided with notice of the alleged assignment of receivables to ING on the O.W. Denmark invoices (*See* 16-cv-95, Dkt. 144-1, ¶ 14; 16-cv-2051, Dkt. 44-1, ¶ 13), there was no such notice of the assignment of any maritime lien against the vessels provided, which is required under U.S. law as set out in *L&L Oil* and other precedent.

### 2.    The Buyer's Contractual Obligations under the O.W. Bunker Terms and Conditions Are Not Enforceable Against the Vessels

ING incorrectly asserts in its Motions as an uncontested fact that the Vessels themselves, as well as both the owners and charterers of the Vessels in these cases, fall within the definition of "Buyer" in the underlying fuel supply agreements and are therefore "bound and obligated jointly and severally to the Confirmation and General Terms."[19]  To bolster its arguments that the Vessels *in rem* (and presumably their owners) must be liable to ING for the cost of the fuel supplied to the vessels, plus contractual interest and costs, based on an order placed by the charterers, ING first includes within its motion specious arguments that conflate maritime liens

---

[18] Even the transaction documents attached by ING as exhibits to the complaints in these cases fail to sufficiently notify of any assignment of a maritime lien.  *See* Dkt. 1 in each of the respective cases.

[19] 16-cv-2923, Dkt. 57 at para. 3-6; 16-cv-95, Dkt. 144-1 at para. 4; 16-cv-2051, Dkt. 44-1 at para. 4.

with contractual obligations. ING asserts without basis that the Vessels and their owners are bound by buyer's obligations in fuel supply contracts. ING tries to merge parties and claims to impose contractual liability on non-party owners and charterers in the guise of an *in rem* action by inserting improper contract damages into the respective complaints in these cases. ING also appears to conflate the nature of contract claims (which are assignable and may have been assigned by the language of the Security Agreement), with maritime lien claims which have not been assigned by the Security Agreement.

Under New York law, it is a well-established rule that "a contract cannot bind a non-party." *D'Antonio v. Metro. Transp. Auth.*, No. 06-4283, 2008 U.S. Dist. LEXIS 16726 (S.D.N.Y. Mar. 4, 2008) (citing *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1256 (S.D.N.Y. 1995); *see also MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) ("It is well established that, generally, a party who is not a signatory to a contract cannot be held liable for breaches of that contract.") (citing *Black Car & Livery Ins., Inc. v. H &W Brokerage, Inc.*, 28 A.D.3d 595, 813 N.Y.S.2d 751, 752 (App. Div. 2006). New York law recognizes three overlapping exceptions to this well-established rule. Specifically, a non-signatory may be held liable for failure to satisfy contractual obligations where the non-signatory (1) is the alter ego of the signatory, (2) manifests an unequivocal intent to be bound by the contract, or (3) is in privity of contract or assumed obligations under the contract. *M.S.S. v. Century Sur. Co.*, No. 15-2801, 2015 U.S. Dist. LEXIS 146517, *27-28 (S.D.N.Y. Oct. 28, 2015) (citing cases).

Consistent with this principle, where a maritime lien "attaches when necessaries are ordered by and supplied to a charterer...[t]he owner of the vessel is not itself liable for payment...unless it has entered into the contract for the supply of necessaries. It has no personal

obligation even though a lien attaches to its vessel." *Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*, 724 F.2d 1161, 1163 (5th Cir. Tex. 1984) (citing G. Gilmore & C. Black, The Law of Admiralty §§ 9-19 (2d ed. 1975)).

No exceptions to the general rule against binding third parties are present here. While the O.W. Terms and Conditions or O.W. Bunker invoices may purport to define the "Buyer" to include owners and charterers of vessels, that is without any force and effect for the purpose of asserting an *in rem* lien claim against any party other than the subject Vessel itself. ING cannot through these Motions impose contractual liability and damages outside the scope of any CIMLA necessaries lien (should any such liens be found to have been assigned). As discussed below, maritime liens cannot be recharacterized as contractual rights that may be assignable under the provisions of the Security Agreement.

### 3. The Security Agreement Does Not Expressly Assign a Maritime Lien Right

The Security Agreement does not expressly assign maritime liens in any way to any entity. The Security Agreement by its terms is governed by English law; applicable rules of construction require a review of the context of the agreement as well as the language of the agreement to interpret its scope and meaning. The failure to have expressly referenced and assigned maritime liens in the Security Agreement, or even to have referred to maritime liens at all in that Agreement, is a fact that ING's English law expert tellingly ignores.

The Declarations by Mr. Hancock (filed concurrently) and Mr. Zacaroli (16-cv-95, Dkt. 144-4; 16-cv-2923, Dkt. 58-4) agree that English law rules of contractual construction applicable to the Security Agreement include the following:

(1) The contract is to be considered as a whole.

(2) Each part of the contract is, if possible, to be given some meaning. It is to be presumed that the parties did not insert words into their contract which are pure surplusage.

(3) The contract should be construed so as to make business commonsense.

(4) The contract should be construed against the relevant factual background or matrix. By this is meant the facts which were known to both parties as at the time of the contract.

Hancock Declaration p.7, para. 12(1)-(4)

Mr. Hancock also includes another critical rule of construction with Mr. Zacaroli omits

from his own declaration, namely that the construction of any ambiguity must be held against the

drafter:

> In case of ambiguity, the contract should be construed *contra proferentem*, i.e. in a manner which is adverse to the draftor. *See Lewison on The Interpretation of Contracts* (the leading English textbook on the interpretation of contracts) at paragraphs 388-402.

Hancock Declaration p.7, para. 12(5).[20]

Starting with the language of the contract, none of the defined terms or relevant

provisions in the Security Agreement mention maritime liens. ING's Security Agreement

defines "Security Asset" as:

> Security Assets means all assets and rights, title and interest of each Receivables Chargor, each Danish Receivables Chargor, each Insurance Chargor and each Brokerage Chargor held in these respective capacities which are the subject of any security created by this Deed.

It defines "Supply Receivables" as follows:

> Supply Receivables means any amount owing, or to be owed, to a Receivables Chargor or a Danish Receivables Chargor under any Supply Contract.

---

[20] Similarly, under New York law, "[i]n construing a contract [courts] look to its language, for 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *Quadrant Structured Prods. Co., Ltd. v Vertin*, 23 N.Y.3d 549, 559-560 (N.Y. 2014) (citations omitted). An ambiguity in a contract is interpreted against the drafter. *McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002).

The Security Agreement then defines "Supply Contract" as follows:

> Supply Contract means any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case governed by English law and relating to the sale of oil products traded by the Group, as governs:
>
> (a)    the contractual relationship between the relevant debtor and a Receivables Chargor at any time;
>
> (b)    the contractual relationship between the relevant debtor and a Danish Receivables Chargor as at the date of this Deed,
>
> and shall in each case included any invoice issued thereunder (excluding in each case any such agreement between a Danish Receivables Chargor and DFDS A/S and any invoice issued thereunder).

(Security Agreement Clause 1.1).

Finally, Clause 2.3 of the Security Agreement, upon which ING relies most heavily as the lynchpin for the assignment from O.W. Bunker giving rise to the right to arrest Vessels in these action, nowhere mentions maritime liens.

While the defined terms and Clause 2.3 offer no support for ING's position on assignment, the context of the agreement too fails to support assignment of maritime liens through the Security Agreement. Most importantly, the Security Agreement could have said, but did not, that any U.S. maritime liens accruing in O.W. Bunker's favor were assigned to ING. Neither the Security Agreement nor any language in any of ING Bank's finance documents proffered to the Court in support of the Motions mentions or assigns "maritime liens." This is not surprising – the Security Agreement is governed by English law: under English law maritime liens cannot be assigned and, under English law, no maritime lien is granted for the supply of bunkers. *See* Hancock Declaration, p. 6, para. 10; *see also, e.g., North End Oil, Ltd. v. M/V Ocean Confidence*, 777 F. Supp. 12, 13 (C.D. Cal. 1991) (court dismissed action applying English law, which grants no maritime lien for supply of bunkers); *accord*, Declarations of Mr.

26

Peter John Sibley MacDonald Eggers QC filed in Clearlake Shipping Pte Ltd. v. O.W. Bunker (Switzerland) SA, et al., Case No. 14-cv-9287 (S.D.N.Y.) (VEC), Power Decl., Exs. 2(a) and (c); Pincus Decl. Exs. 2(a) and (c).  Since English law does not permit the assignment of maritime liens, business common sense dictates that such liens would never have been assigned pursuant to an English law assignment agreement.  Accordingly, the parties to the Security Agreement did not provide for such liens to be assigned, and indeed did not even mention maritime liens.  This is particularly notable, given that ING would have been aware that O.W. Bunker was in the business of, among other things, supplying vessels with fuel and had the O.W. Terms and Conditions incorporated into the underlying fuel supply agreements. It is also inconceivable that ING was unaware at the time of the Security Agreement's execution that O.W. Bunker might claim that it had a maritime lien against vessels supplied with bunkers pursuant to the O.W. Terms and Conditions. The O.W. Terms and Conditions expressly refer to maritime liens and carve out maritime liens from English law, instead making such liens governed by U.S. law. By contrast, the Security Agreement does not even mention maritime liens.

ING and its O.W. Bunker counterparties did not intend to assign such maritime liens where such assignment would not have been permitted under English law, the law governing the Security Agreement.  Rather, it is far more likely and consistent with business common sense, based upon the facts known to the parties at the time of the Security  Agreement,  that the parties' intentions with respect to the credit facility and the Security Agreement were to protect the ING and the other banks' positions with respect to receivables arising out of O.W. Bunkers' derivatives oil trading business, for which there was far greater risk, and which losses indeed ultimately led to the collapse of O.W. Bunker.  *See* Report (Power Decl. Ex. 1; Pincus Decl. Ex. 1).

### 4.   The Security Agreement Does Not Implicitly Assign a U.S. Maritime Lien Right

ING dances around the failure of the agreement to assign maritime liens expressly, instead arguing that the assignment under the Security Agreement encompassed all of O.W. Bunker's "rights, title and interest in respect of the Supply Receivables," with Supply Receivables further defined as any amount owing to O.W. Bunker "under any Supply Contract." According to ING, this assignment includes the U.S. maritime liens of O.W. Bunker. In support of this erroneous position, ING relies on the declaration of Antony Zacaroli, an English barrister, who concludes that the assignment with the phrase "in respect of" the Supply Receivables must have included a corresponding assignment of any *in rem* maritime lien claim that O.W. Bunker may have had against the vessel to which the bunkers were supplied. ING's entire argument rests on the broadest possible interpretation of the three words "in respect of" to refashion a lengthy and detailed Security Agreement to allegedly include U.S. maritime liens and to support ING's strategy to recover its losses by wrongfully arresting vessels and strong-arming innocent owners for extortionate payments. Moreover, ING fails to proffer any evidence that the Credit Agreement itself provides for the financing collateral to include maritime liens, presumably because the Credit Agreement, like the Security Agreement, never mentions maritime liens, and speaks only of collateral in terms of cash, cash equivalents, and other substantive proprietary rights.

ING's reliance upon the phrase "in respect of" for its entire argument that the Security Agreement assigned maritime liens is, in Mr. Hancock's view, "reading too much into these words." Hancock Declaration, p. 9, para. 16(6). As Mr. Hancock notes, the phrase "in respect of" was mandated grammatically – it would not be grammatically correct to refer to "rights under the Supply Receivables" or "title and interest under the Supply Receivables" or "title and

interest arising out of the Supply Receivables." ING hangs its entire argument on the phrase "in respect of"; this phrase, however, does not reveal an intention to assign maritime liens. "In respect of," simply, is the only phrase that works grammatically, and should not be interpreted to incorporate the assignment of maritime liens in the Security Agreement when the Security Agreement is entirely silent with respect to U.S. maritime liens.

What is assigned under the Security Agreement is the right to sums of money, as evidenced by repeated references to sums receivable under supply contracts, insurance contracts and brokerage agreements. Hancock Declaration, p.8, para. 16(1). The language of Clause 2.3 of the Security Agreement focuses on substantive rights – "title" and "interest" refer to proprietary rights, and "rights" in respect of a contract refer to contractual rights. Hancock Declaration, p.8, para. 16(2). Maritime liens, however, are neither contractual rights, nor proprietary rights, nor substantive rights. Instead, maritime liens arise from law, not contract, and are procedural rights, not substantive rights. Hancock Declaration, pp. 8-9, para. 16(3) and (4). A maritime lien is a mechanism to enforce a claim for the payment of money, and is not a substantive right in itself. Therefore, maritime liens fall within a different category than the substantive rights assigned under the Security Agreement.

ING further relies upon a skewed interpretation of the Security Agreement's definition of Supply Receivables as the basis for its assignment rights. That term is premised upon amounts owing or to be owed "under any Supply Contract." A U.S. maritime lien claim against a vessel, however, does not arise "under any Supply Contract," but rather arises under the CIMLA, which grants a maritime lien to a materialman who supplies necessaries to the Vessel "on the order of the owner or a person authorized by the owner...." As recently affirmed in a decision of this Court concerning another dispute arising from O.W. Bunker's collapse, "it is a bedrock principle

of admiralty that such liens can arise only by operation of law and not by agreement of the parties." *O'Rourke Maritime Services L.P., L.L.P. v. M/V Costco Haifa et al*, Case No. 15-cv-2992, Dkt. No. 79 at 8 (S.D.N.Y. Apr. 16, 2016)(SAS) (*citing Bird of Paradise*, 72 U.S. 545, 555 (1866) (maritime liens exist "independently of the agreement of the parties"); *Newell v. Norton*, 70 U.S. 257, 262 (1865) ("Maritime liens are not established by an agreement of the parties . . . . [t]hey are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist.")); *see also, Valero Mktg. and Supply Co. v. M/V ALMI SUN, IMO No. 9579535,* No. 14-2712, 2015 WL 428217 (E.D. La. Dec. 28, 2015). Maritime liens simply cannot be created by contract.  Because no maritime lien arises "under any Supply Contract", it follows logically that any amount due and owing under a maritime lien also does not arise "under any Supply Contract."  Nowhere does the Security Agreement, by its written terms, extend to claims arising "under CIMLA" or even "in respect of" any Supply Contract.

The definition of "Supply Contract" itself also shows that maritime liens arising under the O.W. Terms and Conditions were not assigned.  The Security Agreement assigns the rights, title and interest of O.W. Bunker in respect of the "Supply Receivables," which are defined as amounts owing, or to be owed, under any "Supply Contract. "Supply Contract" is, in turn, defined as "any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case GOVERNED BY ENGLISH LAW . . ." (Security Agreement, Clause 1.1) (emphasis added). The O.W. Terms and Conditions are governed by English law, but maritime liens are carved out – the O.W. Terms and Conditions expressly provide that maritime liens are governed by U.S.

law. The Security Agreement, which assigns only contracts governed by English law, did not assign maritime liens governed by U.S. law. *See* Hancock Declaration, p. 10, para. 16(9).

Finally, the rules of contractual construction include the requirement that any ambiguity in a contract must be construed against its drafter. Here, ING was the drafter of the Security Agreement, and any ambiguity, under the doctrine of *contra proferentem*, must be construed against ING. Hancock Declaration, p. 10, para. 16(9)(a); *accord, Quadrant Structured Prods. Co., Ltd. v Vertin*, 23 N.Y.3d 549, 559-560 (N.Y. 2014) (citations omitted); *McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) (an ambiguity in a contract is interpreted against the drafter). The Security Agreement does not mention maritime liens, and does not assign any procedural right, such as maritime liens; if, however, there is any ambiguity concerning whether the Security Agreement validly assigns maritime liens, such ambiguity must be construed against ING.

### 3. The Settlement Agreement Executed by O.W. Switzerland Does not Cure any Defect in the Assignment – it Merely Gives up O.W. Switzerland's Liquidator's Independent Right to Assert Claims

With respect to the *Cobelfret* action (16-cv-3456), where O.W. Switzerland acted as the contract counterparty for the fuel delivery, nothing in the Settlement Agreement between ING and the liquidator of O.W. Switzerland, by which O.W. Switzerland allegedly "accepted and acknowledged the validity of the assignment," (16-cv-3456, Dkt. 107-4) purported to expand the scope of the original assignment given in the Security Agreement, and ING does not argue otherwise. Thus, the Settlement Agreement and related letter concerning the satisfaction of conditions precedent (approval of the creditors) *is not relevant* to the question whether the assignment was broad enough to encompass ING's maritime lien claims, which are not recognized under English law. O.W. Switzerland, by the Settlement Agreement, has merely agreed that it will not challenge (in the context of the Swiss liquidation proceeding) ING's right

to collect O.W. Switzerland receivables directly from customers. Such an agreement does not create a valid maritime lien or assignment of such lien in favor of ING.

## V.   CONCLUSION

Wherefore, the defendants in these actions, M/V TEMARA, M/V VOGE FIESTA, M/V OCEAN HARMONY and M/V MARITIME KING respectfully submit that ING's Motion for Partial Summary Judgment with respect to the validity of its alleged maritime lien should be denied in its entirety and that this Court should find that ING does not possess a maritime lien against the Vessels. Alternatively, defendants submit that discovery should be ordered pursuant to Fed. R. Civ. P. 56(d) on various issues and defenses, including but not limited to whether O.W. Bunker engaged in fraud sufficient to invalidate any maritime lien it would otherwise acquire under the CIMLA for the fuel deliveries, as well as discovery as to ING and O.W. Bunker's intentions with respect to the assignment of a maritime lien under the Security Agreement.

Dated: September 15, 2016
       New York, New York

                    HOLLAND & KNIGHT LLP


                    By: _/s/ James H. Power_____
                    James H. Power
                    Marie E. Larsen
                    31 West 52nd Street
                    New York, New York 10019
                    Telephone: 212-513-3200
                    Fax: 212-385-9010
                    Email: james.power@hklaw.com
                           marie.larsen@hklaw.com

                    *Attorneys for Defendants M/V Temara, M/V Voge
                    Fiesta, M/V Maritime King*

32

REED SMITH LLP

By: _/s/ Andrea Pincus_____
Andrea Pincus
Jane Sarma
599 Lexington Avenue
New York, New York 10022
Telephone: 212-521-5400
Fax:  212-521-5450
Email: apincus@reedsmith.com
      jsarma@reedsmith.com
*Attorneys for Defendant M/V Ocean Harmony*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that, on September 15, 2016, a true and correct copy of the captioned document was served upon all counsel of record via ECF.


*/s/ James H. Power*
James H. Power


*/s/ Andrea Pincus*
Andrea Pincus