UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ING BANK N.V., <br><br> Plaintiff, <br><br> - against - <br><br> M/V TEMARA, IMO No. 9333929, her engines, tackle, equipment, furniture, appurtenances, etc., *in rem*, <br><br> Defendant. | No. 16 Civ. 95 (LLS) <br><br> ORAL ARGUMENT REQUESTED |
| ING BANK N.V., <br><br> Plaintiff, <br><br> - against - <br><br> M/V VOGE FIESTA, IMO No. 9168154, her engines, tackle, equipment, furniture, appurtenances, etc., *in rem*, <br><br> Defendant. | No. 16 Civ. 2051 (LLS) <br><br> ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW OF ING BANK N.V. IN SUPPORT OF
ITS MOTION FOR PROTECTIVE ORDER**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 3

ARGUMENT .................................................................................................................................. 6

I.    COURTS MAY LIMIT DISCOVERY SOUGHT BY PARTIES ..................................... 6

II.   THE WITHHELD PERSONAL DATA IS IRRELEVANT TO THESE PROCEEDINGS ..................................................................................................... 8

III.  GOOD CAUSE EXISTS TO PREVENT DISCLOSURE OF THE WITHHELD INFORMATION ............................................................................................ 9

      A.    The GDPR Prohibits Disclosure of the Requested Information ........................... 9

            1.    Disclosure Would Violate Article 5(1)(c) ................................................ 11

            2.    Disclosure Would Violate Article 5(1)(a) and Article 6(1) ..................... 11

            3.    Disclosure Would Violate the GDPR's General Prohibition on Transfer of Personal Data to Non-EEA Jurisdictions .............................. 13

      B.    ING Risks Significant Fines Under the GDPR .................................................... 14

CONCLUSION ............................................................................................................................. 16

# TABLE OF AUTHORITIES

**Page**

## CASES

*Barcliff, LLC v. M/V Deep Blue*,
 876 F.3d 1063 (11th Cir. 2017) .................................................................................................. 2

*Collens v. City of N.Y.*,
 222 F.R.D. 249 (S.D.N.Y. 2004) ................................................................................................ 7

*Herbert v. Lando*,
 441 U.S. 153 (1979) .................................................................................................................... 7

*The Kalfarli*,
 277 F. 391 (2d Cir. 1921) ............................................................................................................ 4

*In re N.Y. Racing Ass'n*,
 No. 06-cv-12618, 2016 Bankr. LEXIS 3746 (Bankr. S.D.N.Y. Oct. 17, 2016) ........................ 6

*In re Sur. Ass'n. of Am.*,
 388 F.2d 412 (2d Cir. 1967) ........................................................................................................ 7

*In re Terrorist Attacks on September 11, 2001*,
 454 F. Supp. 2d 220 (S.D.N.Y. 2006) ................................................................................. 8, 15

*Palumbo v. Shulman*,
 No. 97-cv-4314, 1998 U.S. Dist. LEXIS 11467 (S.D.N.Y. July 24, 1998) .............................. 7

*Rosas v. Alice's Tea Cup, LLC*,
 127 F. Supp. 3d 4 (S.D.N.Y. 2015) ............................................................................................ 7

*Rubin v. Hirschfeld*,
 No. 00-cv-1657, 2002 U.S. Dist. LEXIS 27369 (D. Conn. Jan. 15, 2002) ............................... 6

## RULES AND STATUTES

Commercial Instruments and Maritime Lien Act,
 46 U.S.C. § 31342 ....................................................................................................................... 2

Fed. R. Civ. P. 26(c) ..................................................................................................... 1, 6, 8

Fed. R. Civ. P. 34 ........................................................................................................................ 1

Fed. R. Civ. P. 56 ........................................................................................................................ 1

**TABLE OF AUTHORITIES**

Page

**FOREIGN AUTHORITIES**

Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation), OJ 2016 L 119/1. .................................................*passim*

ING Bank N.V., as Security Agent ("ING"), respectfully moves for a protective order pursuant to Fed. R. Civ. P. 26(c) in response to discovery requests by the M/V TEMARA and the M/V VOGE FIESTA (together, the "Vessels") seeking the disclosure of certain redacted and withheld personal data, in response to this Court's direction at the September 13, 2019 status conference that the parties brief the question whether the EU General Data Protection Regulation (the "GDPR") prohibits disclosure of such information in these actions.

## PRELIMINARY STATEMENT

Nearly one year ago, the Vessels requested, and this Court granted, limited discovery into a narrow issue: whether, in the thirty days prior to filing for bankruptcy, O.W. Bunker & Trading A/S ("O.W. Denmark") knew that it was insolvent and nonetheless entered into contracts with its customers (the Vessels) to sell fuel, without intending to pay its subcontractors for the fuel that O.W. Denmark contracted to supply.

Although the Vessels repeatedly represented they were seeking only "very, very limited" discovery on this issue from O.W. Denmark pursuant to Federal Rule of Civil Procedure 56, the Vessels instead propounded extensive Rule 34 discovery requests on ING seeking, among other things, documents and information concerning the lending arrangement between ING, as Security Agent, and O.W. Denmark. Although ING objected to the relevance and scope of these requests, ING produced over 5,000 pages of documents to the Vessels. The substance of these communications was produced in full. However, ING redacted the names, phone numbers, and other personal information of personnel at ING, O.W. Bunker, and other lenders, and objected to the Vessels' interrogatories on the ground that the interrogatories did not seek information relevant to the Vessels' proffered affirmative defense.

The information withheld by ING concerns only the names of those involved in the financing arrangement with the O.W. Bunker group, not the fuel supplies to the Vessels or

O.W. Denmark's payments to its subcontractors. Further, the Vessels have never pleaded any bad faith by ING. Instead, the Vessels' theory is premised entirely on an alleged "scheme" by borrower O.W. Denmark to supply fuel in the ordinary course to the Vessels—its customers—but to withhold payment from its subcontractors in these fuel supplies.[1] The personal data of individuals who were involved in the financing has no bearing on the Vessels' theory.

In addition, ING has determined that the processing and transfer of this personal data under the circumstances would place ING, a Dutch bank, in violation of the data protection principles set forth in the recently-passed GDPR. These regulations prohibit the "processing" or "transfer" of EU citizens' personal data to outside jurisdictions (such as the United States) unless strict conditions are met, and subjects violators to unprecedented fines.

As set forth in detail below and in the attached joint Declaration of David Anthony Smith and Nicole Wolters Ruckert ("GDPR Decl."), the disclosure of the personal data sought by the Vessels would place ING in potential violation of three separate requirements under the GDPR: (1) Article 5(1)(c)'s "data minimisation" principle; (2) Articles 5(1)(a) and 6(1)'s requirement that data be "processed lawfully," and (3) Articles 44 through 49, which generally prohibit the transfer of data to outside jurisdictions. In sum, each of these provisions prohibits ING from disclosing personal data unless such processing is relevant and necessary in light of the purpose for which it is being processed. Here, because the personal data ING withheld is entirely irrelevant to the claims and defenses in this litigation, there is simply no

---

[1] Although the Vessels' theory is totally unsupported by the record, it is also unclear why the Vessels believe that it is a defense to the *Vessels'* payment obligation under 46 U.S.C. § 31342 to allege that O.W. Denmark sought to withhold payment to its *subcontractors* – for necessaries that the Vessels received and consumed without incident and for which the Vessels have consistently refused to remit payment. *See Barcliff, LLC v. M/V Deep Blue*, 876 F.3d 1063, 1074 (11th Cir. 2017) ("payment by the general contractor to the subcontracted supplier is immaterial to the general contractor's lien—it arises at the moment the subcontractor renders performance on the general contractor's behalf.").

basis under the GDPR that would justify its disclosure.[2]

What is more, the Vessels are in possession of the full, unredacted substance of all non-privileged communications produced by ING. To the extent any "bad faith" exists (which ING vigorously disputes), it should be apparent from the content of those e-mails, regardless of the precise identities of the senders and recipients. Should the Vessels identify a particular e-mail which they believe lends credence to their allegations, ING would be willing to meet and confer to discuss the Vessels' position and reevaluate whether the disclosure of personal data would be relevant and necessary to their defense, such that disclosure is permissible within the context of this litigation. At present, however, ING is not aware of a single e-mail produced in this matter which supports the Vessels' affirmative defense. Accordingly, ING remains of the view that disclosure of personal data risks subjecting ING to liability under the GDPR is not necessary and that there is good cause to withhold the information under the Federal Rules.

In view of the irrelevance of the personal data sought under the Federal Rules of Civil Procedure, as well as the significant liability that ING faces should it be found in violation of the GDPR, ING respectfully requests that the Court enter a protective order for the reasons set forth herein.

**FACTUAL BACKGROUND**

Although it is difficult to glean from their vague pleadings, the Vessels' primary defense to ING's maritime lien claim appears to be that O.W. Denmark never intended to pay its

---

[2] ING has already produced the documents related to the fuel bunker transactions which identify the persons involved and who would have the best information available about whether those transactions proceeded in the ordinary course, or if there was "bad faith" in connection with those transactions (even though the Vessels' theory is without support in the record). This includes all documents establishing the supply chains for fuel delivered to the Vessels and internal O.W. Bunker emails reflecting the orders made in the ordinary course. By contrast, the documents concerning the financing of O.W. Bunker's working capital do not support the Vessels' theory and are entirely unrelated to the fuel supply transactions at issue, making the identities of those citizens irrelevant to ING's claim for a maritime lien or the Vessel's "bad faith" defense concerning those transactions.

3

subcontractors for the fuel supplies at issue in these matters, and that this alleged "bad faith" excuses any obligation to pay for the fuel that the Vessels indisputably received.[3]  In October 2018, the Vessels requested, and this Court granted, limited discovery the issue of whether, in the thirty days prior to O.W. Denmark's bankruptcy filing, O.W. Denmark knew that it was insolvent and nonetheless entered into contracts for the purchase of fuel, without intending to pay its subcontractors for that fuel.

The Vessels' counsel summarized its discovery request as follows:

> [W]e believe there was a concerted effort <u>on behalf of O.W. the organization</u> to engage in a very aggressive 30-day period in which they were trying to deliver as much fuel as possible to vessels. Getting that fuel from a third party, knowing they were never going to pay anyone for it. . .
>
> We think that is the reason why there should be a very, very limited discovery into the issue of whether or not there was bad faith <u>on the behalf of the O.W. entity</u> 30 days prior. All these invoices -- this isn't a long period of time. This is 30 days. We have from the beginning of October until November 4 or November 6 when they filed for bankruptcy. That was the mad rush to enter into as many fuel sale contracts as possible. So they can sell fuel, get it from somebody else, so it was no money out of their pocket, and to be able to take that money possibly later and give it to a secured creditor.
>
> So, there's 30 days of discovery – within a 30-day period of discovery, a couple of issues. <u>Whether O.W. was insolvent at the time it was entering into these contracts. Under Danish law, it is illegal to enter and conduct business when you are insolvent. The second question is again whether or not they knew that they had no money and they were entering  into these contracts. And that's it</u>.  So it is a very limited period of discovery and a very limited focus.

*See* Decl. of Brian P. Maloney ("<u>Maloney Decl.</u>"), Ex. A (Oct. 15, 2018 Tr. at 16:21-25, 17:10-18:3) (emphases added).  The Vessels' counsel also represented that it would need "60 days" to

---

[3] ING disputes that "bad faith" or "fraud," even if true, is a valid defense to a maritime lien.  *See The Kalfarli*, 277 F. 391, 396-97 (2d Cir. 1921) ("[T]he fraudulent conduct of a materialman does not extinguish his right to proceed in a common-law court in personam, and we are cited to no authority which shows that he loses his right to proceed in admiralty in personam or in rem *to enforce his lien for work actually done or for supplies actually furnished*.") (emphasis added).

4

conduct "foreign discovery" because "they [O.W. Denmark] are in Denmark." *Id*. at 19:11-20.

Notwithstanding the Vessels' repeated representations concerning the "limited focus" of its discovery, which plainly centered on *O.W. Denmark's* actions and intent, the Vessels never sought foreign discovery from O.W. Denmark. Instead, in December 2018, the Vessels served extensive discovery requests on *ING*, seeking, among other things, documents and information concerning various aspects of the financing extended to the O.W. Bunker group. *See* Maloney Decl. Exs. B through E (Vessels' discovery requests).

ING timely served its responses and objections to the Vessels' requests on January 7 and 9, 2019, which were amended in part on August 21, 2019. *See id*. Exs. F through I. As part of its responses, ING objected to the Vessels' interrogatories as overbroad, unduly burdensome, and irrelevant. *See id*. Exs. H and I. The parties met and conferred on two separate occasions, but the Vessels never narrowed their demands.

On May 7, 2019, ING made an initial production of nearly 1,000 pages of documents, which included internal e-mails among the O.W. Bunker entities involved in the fuel supplies to the M/V Temara and the M/V Voge Fiesta. These documents were produced in their full, unredacted format, and displayed the names of the O.W. Bunker personnel who were directly involved in the fuel supplies at issue. Under the Vessels' own theory as represented in its pleadings and to the Court, these O.W. Bunker personnel would be the individuals with direct knowledge of any alleged "bad faith" scheme to withhold payment from subcontractors.

On August 21, 2019, ING produced nearly 5,000 additional pages of documents, which included both internal and external ING communications related to the financing arrangement with the O.W. Bunker group. However, ING redacted the names, e-mail addresses, and other personal information of ING and O.W. Bunker personnel (as well as that of other lenders involved in the financing arrangement) in order to comply with its obligations under the

5

GDPR.

On September 10, 2019, three days before the parties were scheduled to appear before this Court, the Vessels sent a letter to ING objecting for the first time to ING's redactions and its responses to the Vessels' interrogatories (which had been served eight months prior).  At the September 13 hearing, this Court directed the parties to brief the narrow issue of why the GDPR mandates protection of the redacted and nondisclosed personal data, and why such protection should be honored by an American court.

## ARGUMENT

### I. COURTS MAY LIMIT DISCOVERY SOUGHT BY PARTIES

Under Federal Rule of Civil Procedure 26(c), a court may for "good cause" issue a protective order limiting the disclosure of certain material or information.  However, as a threshold matter, the court must first determine whether the documents sought are relevant in the first place. *See In re N.Y. Racing Ass'n*, No. 06-cv-12618, 2016 Bankr. LEXIS 3746, at *43-44 (Bankr. S.D.N.Y. Oct. 17, 2016) ("The showing of 'good cause' required under Rule 26(c) is predicated on the documents or information sought being relevant in the first place to the dispute being adjudicated."); *Rubin v. Hirschfeld*, No. 00-cv-1657, 2002 U.S. Dist. LEXIS 27369, at *5 (D. Conn. Jan. 15, 2002) ("[T]he parties seeking discovery [] must first establish that the discovery sought is relevant to the claims and defenses plead.") (entering protective order against discovery into plaintiff's business relationships with nonparties to any claim or defense).  As such, "[a]n overly broad request may justify issuance of a protective order precluding irrelevant discovery."  *In re N.Y. Racing Ass'n*, 2016 Bankr. LEXIS 3746, at *4 (internal quotation marks and citation omitted).

Relevance under Rule 26 "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or

6

may be in the case." *See Palumbo v. Shulman*, No. 97-cv-4314, 1998 U.S. Dist. LEXIS 11467, at *10 (S.D.N.Y. July 24, 1998). It is well-settled that parties should not be permitted to "roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *Id*. at *14 (quoting *In re Sur. Ass'n. of Am.*, 388 F.2d 412, 414 (2d Cir. 1967)). Thus, "[w]hile Rule 26(b)(1) still provides for broad discovery, courts should not grant discovery requests based on pure speculation that amount to nothing more than a 'fishing expedition' into actions or past wrongdoing not related to the alleged claims or defenses." *Collens v. City of N.Y.*, 222 F.R.D. 249, 253-54 (S.D.N.Y. 2004) (individual's home address was not discoverable because it was irrelevant to plaintiff's claim and likely "could be used only for a fishing expedition"); *see also Rosas v. Alice's Tea Cup, LLC*, 127 F. Supp. 3d 4, 8 (S.D.N.Y. 2015) (denying discovery into plaintiffs' immigration status, tax returns, and current employers due to topics' irrelevance to proceedings).

In *Palumbo*, for example, the plaintiff, who claimed that the defendants breached the parties' management agreement, sought broad discovery into the defendants' relationships and agreements with its other clients, as well as two loans made to plaintiff by one of defendant's clients. *See* 1998 U.S. Dist. LEXIS 11467, at *3-8. The court entered a protective order against these requests, as they had "no bearing on this lawsuit, which concerns [plaintiff's] contract with [defendant]." *Id*. at *9-16.

If information is relevant to the claims and defenses pleaded, a court may nonetheless issue a protective order for "good cause" in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c); *see also Herbert v. Lando*, 441 U.S. 153, 177 (1979) ("[T]he district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" (alteration in original)).

"Ordinarily, good cause exists when a party shows that disclosure will result in a clearly defined, specific and serious injury." *In re Terrorist Attacks on September 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).

## II.   THE WITHHELD PERSONAL DATA IS IRRELEVANT TO THESE PROCEEDINGS

As discussed above, the names, addresses, and other personal data of ING and O.W. Bunker personnel (and personnel at other lenders) involved in the financing arrangement is irrelevant to the Vessels' "bad faith" defense, which is premised solely on the allegation that O.W. Denmark, knowing that it was insolvent, entered into contracts for the purchase of fuel without any intention of paying.  *See Palumbo*, 1998 U.S. Dist. LEXIS 11467.

Rather than seeking discovery from O.W. Denmark (as they represented they would to this Court), the Vessels served over thirty document requests on ING seeking material relating to its extension of a credit facility to the O.W. Bunker group (as Security Agent for a lending syndicate), as well as interrogatories seeking the names of ING personnel who communicated with O.W. Bunker entities and were involved in the financing.  To be clear, the Vessels have never alleged that ING knew of any purported fraud – nor could they.  Nonetheless, ING produced thousands of pages of requested documents, including both internal communications and external e-mails with O.W. Bunker personnel.

To the extent that any of these documents supports the Vessels' bad faith defense (which they do not), such support would presumably be found in the content of the e-mails, which remains in full, unredacted format, together with the domain names of the senders and recipients of each email (e.g., "@owbunker.com" or "@ingbank.com").  But the names, addresses, and telephone numbers of the individuals on those e-mails would be entirely irrelevant to the Vessels' defense, because the existence of such information does not make bad faith any

8

more or less plausible.

Nevertheless, not a single document produced by ING suggests any bad faith by O.W. Denmark or any other O.W. Bunker entity. Certainly, the Vessels have never identified an e-mail redacted by ING which even suggests support for their theory, such that the name of the sender or recipient may arguably become relevant. As noted above, should the Vessels identify such an e-mail, ING is willing to meet and confer to discuss the Vessels' position and reevaluate whether to disclose the redacted material. However, at this time, ING is compelled by its obligations under the GDPR to withhold that personal data, as set forth in more detail below.

### III.    GOOD CAUSE EXISTS TO PREVENT DISCLOSURE OF THE WITHHELD INFORMATION

#### A.    The GDPR Prohibits Disclosure of the Requested Information

As set forth in the accompanying joint Declaration of David Anthony Smith and Nicole Wolters Ruckert, the GDPR, which became effective in late May 2018, is designed to safeguard an individual's right to protection of their personal data, which is recognized as a core human right under the EU Charter of Fundamental Rights. *See* GDPR Decl. ¶ 4.1. Although data protection regulations have been in place in the EU for several decades, the GDPR has increased the already significant rights and remedies afforded to individuals, in order to address the recent "[r]apid technological developments and globalization" which "allows both private companies and public authorities to make use of personal data on an unprecedented scale." *See* GDPR, Recital 6. The GDPR protects more categories of personal information and data than its predecessor, provides additional rights and remedies to individuals (including codifying for the first time the "right to be forgotten"), and imposes far steeper sanctions against violations on data

9

controllers.[4]  As set forth below, because ING faces potential liability under the GDPR should the requested data be disclosed, there is good cause for this Court to enter a protective order.

The "personal data" protected by the GDPR is defined broadly as "any information relating to an identified or identifiable natural person ('data subject'); an identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person."  *See* GDPR Decl. ¶ 4.2 (quoting GDPR Art. 4(1)).  This captures the information withheld by ING here, namely identifiable individuals' names, email addresses and telephone numbers.  *Id*.

The concept of "processing" is also defined broadly in the GDPR as "any operation or set of operations which is performed on personal data or on sets of personal data, whether or not by automated means, such as collection, recording, organisation, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction."  GDPR Art. 4(2).  As a result, the act of disclosing personal data in this litigation would qualify as processing personal data under the GDPR.  GDPR Decl. ¶ 4.4.

In their accompanying Declaration, Mr. Smith and Ms. Wolters Ruckert identify three potential violations of the GDPR that may result from ING's disclosure of the requested personal data: (1) the required application of the "data minimisation" principle under Article

---

[4] Just this morning, the New York Times featured an article on its front page referencing the GDPR, described therein as a "tough new privacy law," in the context of European regulations concerning the "right to be forgotten." *See* Adam Satariano and Emma Bubola, *One Brother Stabbed the Other. The Journalist Who Wrote About It Paid a Price.*, N.Y. TIMES (Sept. 23, 2019), *available at* https://www.nytimes.com/2019/09/23/technology/right-to-be-forgotten-law-europe.html?searchResultPosition=1.

10

5(1)(c), (2) the requirement that data be processed "lawfully" under Articles 5(1)(a) and 6(1); and (3) the general prohibition on the transfer of personal data to non-EEA jurisdictions under Articles 44 through 49.  Notably, data controllers who violate these provisions face significant fines of up to 20 million euros, or 4% of the worldwide annual revenue of the prior financial year, whichever is higher.  *See* GDPR Art. 83(5).

### 1. Disclosure Would Violate Article 5(1)(c)

All processing of personal data falling with the scope of the GDPR must comply with the data protection principles set out in Article 5 of the GDPR.  These principles include, among other things, a requirement that personal data "be adequate, relevant and limited to what is necessary in relation to the purposes for which they are processed."  *See* GDPR Art. 5(1)(c).

As Mr. Smith and Ms. Wolters Ruckert explain, to satisfy the data minimisation principle, "only the personal data that is genuinely necessary for the disclosure exercise" may be processed.  GDPR Decl. ¶ 4.7.  As such, they "do not see . . . why it is necessary to disclose the particular names and addresses of ING and OWB personnel involved in the financing (nor indeed the names/addresses of personnel of other financing parties) in order to establish whether OWB continued to operate despite knowing that it would be unable to pay subcontractors."  *Id*. ¶ 4.8.  Rather, the unredacted contents of the communications produced should provide the information sought by the Vessels concerning their bad faith theory without having to disclose the precise identities of the individuals involved.  *Id*. ¶ 4.9.

### 2. Disclosure Would Violate Article 5(1)(a) and Article 6(1)

Article 5(1)(a) of the GDPR requires that personal data be "processed lawfully, fairly and in a transparent manner in relation to the data subject [the underlying individual to whom the personal data relates]."  In order to meet this "lawfulness" requirement, the processing must satisfy one of the six legal bases set forth in Article 6(1).  *See* GDPR Decl. ¶ 4.10.

11

Three of the six legal bases under Article 6(1) "might potentially be available to ING:" (1) consent by the data subject; (2) that processing is "necessary for compliance with a legal obligation… to which the controller is subject;" or (3) that processing is "necessary for the purposes of the legitimate interests pursued by the controller or by a third party." *Id.* ¶ 4.11 (quoting Art. 6(1)).

Mr. Smith and Ms. Wolters Ruckert conclude that these bases would be difficult to rely on here. *See* GDPR Decl. ¶¶ 4.12-4.21. First, because consent must be "freely given" under the GDPR, both the GDPR and the EDPB suggest that consent is difficult to obtain when it is sought from an employee by its employer, due to fear of, or real risk of, retaliation should the employee refuse. *See id.* ¶¶ 4.12-4.13 (citing GDPR Recital 43 and EDPB guidance). Obtaining consent is further complicated by the practical difficulties that ING would face in obtaining the consent of each and every former and current member of personnel listed on the thousands of pages produced (including personnel at other lenders), as well as former O.W. Bunker personnel whose tenure ended with the bankruptcy five years ago.

Second, the "legal obligation" must be provided by EU law or that of a member state. Thus, it is not possible to rely on this ground for disclosures to U.S. courts. *Id.* ¶ 4.14.

Third, processing of personal data here would not be "necessary for the purposes of the legitimate interests pursued by the controller or by a third party." GDPR Decl. ¶¶ 4.15-4.21. The names of O.W. Bunker and ING personnel involved in the financing—particularly given that the substance of communications was produced in response to the discovery requests—are not necessary to determine whether O.W. Denmark acted in "bad faith" towards its subcontractors. Rather, "[t]he content of the communications is presumably the key information in this respect." *Id.* ¶¶ 4.18-4.20. Further, "as the bad faith allegations were made in respect of OWB and not ING at the time of the disclosure requests, it is difficult to see how the identities of

12

the ING personnel . . . could be necessary in respect of the question at stake. . ." *Id*. ¶ 4.18.

### 3. Disclosure Would Violate the GDPR's General Prohibition on Transfer of Personal Data to Non-EEA Jurisdictions

The GDPR also prohibits transfers to jurisdictions outside the EEA unless (1) the jurisdiction has been subject to an "adequacy" decision by the European Commission determining that the jurisdiction offers an adequate level of data protection, (2) the importing entity has in place one of certain delineated transfer mechanisms, or (3) the transfer of personal data is made subject to one of the "derogations" (exemptions) set forth in Article 49. *See* GDPR Decl. ¶¶ 4.22-4.23. Here, the U.S. is not currently subject to an adequacy decision by the European Commission. Further, it is unlikely that a transfer mechanism could be put into place, as the mechanisms available place substantial restrictions on the recipient's use of the personal data it receives and require the recipient to undertake significant obligations, both in respect of data protection safeguards and in recognizing the rights of individuals in respect of their personal data, including the right to redress a breach of those obligations. *See id.* ¶ 4.24.

Mr. Smith and Ms. Wolters Ruckert accordingly examine whether an Article 49 "derogation" might be available in these proceedings. *Id*. ¶ 4.25. Article 49 provides that, in the absence of an adequacy decision or appropriate safeguards, a transfer of personal data to a third country "shall take place *only* on one of" the limited number of conditions set forth (emphasis added). Only four of the derogations available are potentially relevant here: (a) "explicit[] consent[]" by the data subject, (b) "[t]he transfer is necessary for the establishment, exercise or defence of legal claims," (c) "[t]he transfer is necessary for important reasons of public interest;" and (d) the transfer "is necessary for the purposes of compelling legitimate interests pursued by the controller which are not overridden by the interests or rights and freedoms of the data subject, and the controller has assessed all the circumstances surrounding the data transfer and

has on the basis of that assessment provided suitable safeguards with regard to the protection of personal data." *Id*. ¶ 4.26.

Mr. Smith and Ms. Wolters Ruckert conclude that none of these derogations would apply to the personal data in this case. *Id*. ¶ 4.33. First, as with the use of consent as a legal basis for processing (*see supra* at 12), there is a "high threshold" for Article 49 consent. In comparison to the already high threshold in respect of consent as a legal basis for processing, "[t]he inclusion of the word 'explicit' implies an even higher standard in respect of the obtaining and documentation of such consent." *Id*. ¶ 4.27.

Second, with respect to the legal claims derogation, there must be a "close and substantial connection between the data in question and the specific establishment, exercise or defence of a legal position." *Id*. ¶ 4.28. Here, again, the personal data of ING and O.W. Bunker personnel involved in the financing is irrelevant to the Vessels' defense. *Id*.

Third, the "public interest" derogation is inapplicable because the public interest at issue must be one recognized in EU law or by a member state law. *Id*. ¶ 4.31. Mr. Smith and Ms. Wolters Ruckert find it likely that EU courts and data protection authorities would find disclosure for the purpose of commercial litigation insufficient to meet the public interest ground. *Id*.

Finally, the "legitimate interests" test is essentially the same as that required under Article 6(1)(f) of the GDPR (*see supra* at 12-12), except that here, the interest must be "compelling." *Id*. ¶ 4.32. For the same reasons as set forth above – namely, the lack of necessity of this personal data to the Vessels' "bad faith" theory – this derogation would appear to be likewise unavailable.

    **B.**    **ING Risks Significant Fines Under the GDPR**

Failure to comply with the GDPR puts controllers at risk of significant regulatory

14

fines.  *See* GDPR Decl. ¶ 4.34.  Entities who violate Articles 5, 6, and 44 through 49 are subject to fines of up to €20,000,000 per year or 4% of the total worldwide annual turnover of the preceding financial year, whichever is higher.  *See* GDPR Art. 83(5).  Based on its total worldwide turnover for 2018, ING could accordingly face fines of up to approximately €727,000,000, or approximately $803,500,000.  *See* GDPR Decl. ¶ 4.34.

Because the GDPR only recently entered into force, there is little guidance as to how much ING might be fined for any violation.  However, the data protection authorities of member states, including the Netherlands, have signaled their intention to pursue GDPR violators.  For example, in February 2019, the Dutch Data Protection Authority, Autoriteit Persoonsgegevens, issued guidelines for establishing fines under the GDPR, and adopted the maximum fine structure set forth under Article 83(5).  *See* GDPR Decl. ¶ 4.36.  And just recently, the UK's data protection authority announced that it plans to fine British Airways £189,000,000 and Marriott International £99,000,000 for breaches of the GDPR (albeit for very different breaches arising from security incidents).  *Id*. ¶ 4.35.

ING's potential liability under the GDPR for improper disclosure of personal data is a "clearly defined, specific and serious injury" that provides good cause for entry of a protective order.  *See In re Terrorist Attacks*, 454 F. Supp. 2d 220 at 222.  The potential fines that ING faces are massive, particularly when compared to the sums at issue here (the principal amount of the invoice at issue in the *Temara* matter is $221,812.95, and in the *Voge Fiesta* matter is $171,318.32).  By contrast, the personal data that ING has withheld – names, phone numbers, addresses – has no bearing the Vessels' defense, particularly where the Vessels possess the full, unredacted substance of all communications produced.  ING respectfully submits that it should not be placed in the untenable position of breaching its obligations under the GDPR in order to disclose information that simply has no relevance to these litigations.

## CONCLUSION

ING respectfully requests that the Court grant its Motion for a Protective Order in its entirety, and for such other and further relief as the Court deems just and proper.

New York, New York
September 23, 2019

                                        Respectfully submitted,

                                        SEWARD & KISSEL LLP

                                        By: s/ Bruce G. Paulsen
                                            Bruce G. Paulsen
                                            Brian P. Maloney
                                            Laura E. Miller
                                        One Battery Park Plaza
                                        New York, NY  10004
                                        (212) 574-1200

                                        *Attorneys for ING Bank N.V., as Security Agent*